UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

LANA FAYE REED,                    )
                                   )
            Plaintiff,             )
                                   )
        v.                         )     Case No. 1:11CV213 FRB
                                   )
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,[1] )
                                   )
            Defendant.             )

## MEMORANDUM AND ORDER

This cause is before the Court on plaintiff's appeal of
an adverse determination by the Social Security Administration.
All matters are pending before the undersigned United States
Magistrate Judge, with consent of the parties, pursuant to 28
U.S.C. § 636(c).

### I.  Procedural History

On March 28, 2008, plaintiff Lana Reed filed an
application for Disability Insurance Benefits (DIB) pursuant to
Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq.; and
an application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Act, 42 U.S.C. §§ 1381, et seq., in which she

_____

[1]On February 14, 2013, Carolyn W. Colvin became the Acting
Commissioner of Social Security.  Pursuant to Fed. R. Civ. P.
25(d), Carolyn W. Colvin is therefore automatically substituted
for former Commissioner Michael J. Astrue as defendant in this
cause of action.

claimed she became disabled on May 25, 2005.[2] (Tr. 179-85, 186-94.) On June 11, 2008, the Social Security Administration denied plaintiff's applications for benefits. (Tr. 92-96, 83-84, 85.) At plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on December 3, 2009, at which plaintiff and a vocational expert testified. Plaintiff's husband and daughter also testified at the hearing. (Tr. 27-71.)[3] On August 18, 2010, the ALJ denied plaintiff's claims for benefits finding plaintiff able to perform her past relevant work as a carpet laying assistant, nurses aid, and Head Start assistant as well as other work in the national economy existing in significant numbers. (Tr. 6-26.) On November 8, 2011, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff now seeks review of the Commissioner's final decision arguing that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff claims that in his determination that plaintiff's cognitive impairment did not meet Listing 12.05 (Mental Retardation), the ALJ erred by failing to consider plaintiff's

---

[2] Plaintiff previously filed applications for DIB and SSI in July 2007, which were denied in October 2007. (Tr. 162-69, 170-78, 81, 82, 87-91.) Plaintiff did not pursue these applications further.

[3] A hearing set on May 15, 2009, was rescheduled to permit plaintiff to secure legal representation. (Tr. 72-80.)

school records and by failing to properly assess the medical record of evidence. Plaintiff further contends that, regardless of these errors, the record as analyzed by the ALJ conclusively establishes that plaintiff meets the criteria of Listing 12.05. Plaintiff asks the Court to reverse the decision of the Commissioner and award benefits.

Upon review of the record and the claims raised by plaintiff on this appeal for judicial review, the undersigned finds that substantial evidence supports the ALJ's decision that plaintiff's cognitive impairment does not meet or medically equal Listing 12.05.[4] Accordingly, on the claims raised by plaintiff in this action, the decision of the Commissioner to deny plaintiff benefits should be affirmed.

## II.  Relevant Testimonial Evidence Before the ALJ

A.  Plaintiff's Testimony

At the hearing on December 3, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-seven years of age. Plaintiff lived with her husband and fifteen-year-

---

[4]The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence. However, inasmuch as plaintiff challenges the decision only as it relates to the conclusion that plaintiff's impairment(s) did not meet or equal Listing 12.05, the recitation of specific evidence in this Memorandum and Order is limited to only that evidence relating thereto.

old son.  Plaintiff testified that she completed high school and received vocational training as a certified nurses assistant while she was a senior in high school. (Tr. 32-33.)

Plaintiff testified that she attended special education classes while in school and had difficulty in math, history and English.  Plaintiff testified that she received D's and F's while in school.  Plaintiff testified that she took the CNA test twice and did not pass the written exam on either occasion.  (Tr. 46-47.)

Plaintiff testified that she last worked in May 2007 helping her husband in the carpet laying business.  Plaintiff testified that her duties with this job included helping him lay carpet pad, helping with the tools, and moving the carpet stretcher with her husband.  Plaintiff testified that she worked in this job for three or four years.  Plaintiff testified that prior to working with her husband, she worked at Pyramid Home Mart performing personal and home health care duties such as cleaning, cooking, shopping for groceries, paying bills, and helping with baths. Plaintiff testified that she left this job after one year to go to work with her husband.  Plaintiff testified that prior to working at Pyramid, she worked part time in Head Start classrooms reading to and playing games with children.  Plaintiff testified that she worked in this job for one to two years.  (Tr. 33-35.)

Plaintiff testified that she sustained injuries from a three-wheeler accident in 2007 whereby she suffered a concussion,

a broken leg, and residual blood clotting in the lungs. (Tr. 36.) Plaintiff testified that because of the continued pain and complications from these injuries, she could no longer perform the physical requirements of her job laying carpet or with Pyramid. Plaintiff testified that she could not return to her job at Head Start because she did not believe she could pass the test to become a teacher's aide. (Tr. 50-51.)

Plaintiff testified that she has been taking an antidepressant, Celexa, since the accident in 2007. Plaintiff testified that she currently experiences crying spells, does not often go out in public, and sometimes has feelings of self-doubt. (Tr. 37, 57.)

As to her daily activities, plaintiff testified that she gets up in the morning at 7:00 a.m. and gets her son up and ready, including making sure he has breakfast. Plaintiff testified that her husband makes coffee and she watches the news. Plaintiff testified that, after her husband leaves for work, she visits with her mother who lives next door. Plaintiff testified that her daughter then comes to visit and helps her straighten the house. Plaintiff testified that she can perform household chores such as dusting, vacuuming, mopping, and doing the dishes. Plaintiff testified that she likes to cook. Plaintiff testified that her hobbies include making cross-stitch projects and going fishing in the summer. Plaintiff testified that she does not read because she

does not understand what she reads. Plaintiff testified that she can care for her personal needs. (Tr. 40-43, 46.)

B.   <u>Testimony of Plaintiff's Husband</u>

At the hearing on December 3, 2009, plaintiff's husband, James Reed, testified in response to questions posed by counsel.

Mr. Reed testified that he and plaintiff had been married for nineteen years. Mr. Reed testified that plaintiff has had memory problems since the accident but continues to do all of the housework, even though it may take her a little longer to complete. Mr. Reed testified that he does more of the grocery shopping now than before the accident to try to save plaintiff from experiencing more pain. Mr. Reed testified that, otherwise, he does not do anything different for plaintiff than he did before the accident. (Tr. 61-63.)

C.   <u>Testimony of Plaintiff's Daughter</u>

At the hearing on December 3, 2009, plaintiff's daughter, Chelsea Ketchum, testified in response to questions posed by counsel.

Ms. Ketchum testified that she was currently eighteen years of age and lives two houses from plaintiff. Ms. Ketchum testified that she visits plaintiff on a daily basis and helps her with sweeping, mopping and the dishes. Ms. Ketchum testified that she and her brother always helped with these chores while growing up. Ms. Ketchum testified that her husband helps plaintiff around

the house two or three times a week.  (Tr. 63-65.)

### III.  Relevant Medical and Other Evidence Before the ALJ

Records from Charlston R-1 Secondary Schools show that during the 1984-85 school year, plaintiff was in the seventh grade and obtained grades mostly comprised of C's and D's in subjects such as math, reading, social studies, science, shop, and home economics.  In eighth grade, plaintiff obtained grades mostly comprised of C's and D's in the same subjects.  Standardized testing during the eighth grade showed plaintiff to perform at the third grade level in social studies and science; at the fourth grade level in language and reference materials; and at the fifth grade level in reading and mathematics.  Plaintiff was enrolled in special education classes throughout her elementary school years.  (Tr. 300-02.)

Records from Charleston R-1 High School show that during the 1986-87 school year, plaintiff was in the ninth grade and obtained grades mostly comprised of D's and F's in subjects such as reading, math, job skills, and child care.  Standardized testing during the ninth grade showed plaintiff to perform at the third grade level in science; at the fourth grade level in language arts; at the fifth grade level in reading; and at the sixth grade level in math.  In the eleventh and twelfth grades, plaintiff obtained grades of B's, C's and D's in subjects such as geography, math, reading, science, job skills, and health.  Plaintiff graduated from

high school in May 1990.  (Tr. 221, 305.)

Plaintiff visited the Community Care Center on July 13, 2004, and reported being under a lot of stress due to several family members having died.  Judith Menz, APRN, BC, FNP, diagnosed plaintiff with anxiety and prescribed Zoloft.  (Tr. 440-41.)  On August 3, 2004, plaintiff reported significant improvement.  (Tr. 603-04.)

On May 25, 2007, plaintiff was admitted to the emergency room at St. Francis Medical Center after having been involved in a three-wheeler accident from which plaintiff sustained a laceration to her forehead, neck pain, and tenderness and pain to her left knee and thigh.  Plaintiff subsequently developed an acute pulmonary embolism and deep venous thrombosis.  Plaintiff was ultimately admitted to the hospital on May 31, 2007, and was discharged on June 9, 2007, with repeated follow up.  (Tr. 314-46.)

On July 9, 2007, in relation to follow up examination at the Community Care Center regarding her three-wheeler accident, plaintiff reported a recent onset of increased nervousness, noting that she had two teenagers at home for the summer.  FNP Menz diagnosed plaintiff with anxiety and prescribed Vistaril.  (Tr. 389-90.)

On July 13, 2007, plaintiff was seen by Dr. Price Gholson of the Counseling Center, LLC, for disability evaluation.  During this evaluation, plaintiff reported that she suffered from anxiety

and that she has had panic disorder since her accident. Plaintiff reported that she experienced speech delay as a child and underwent speech therapy. Dr. Gholson noted a speech impediment. Plaintiff also reported having attended learning disabled classes. Plaintiff reported not having any behavioral problems as a child, and that she got along well with her parents. On a Mental Status Examination checklist, Dr. Gholson rated plaintiff as average in nearly all areas of Appearance, Affect, Thought Processes, Intellectual Functions, Insight, and Judgment. Plaintiff's attention and concentration were noted to be average. Dr. Gholson diagnosed plaintiff with panic disorder without agoraphobia and assigned a Global Assessment of Functioning (GAF) score of 60. (Tr. 578-85.)[5] On that same date, Dr. Gholson reported to the Missouri Department of Social Services that plaintiff suffered from anxiety and had been diagnosed with panic disorder without agoraphobia. Dr. Gholson opined that plaintiff would be incapacitated from these impairments for three to five months. (Tr. 576-77.)

During a visit at the Community Care Center on September 6, 2007, plaintiff reported to M. Dicus, APRN, BC, FNP, that she

---

[5]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000) (DSM-IV-TR). A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.

stopped taking her "nerve" pills because they made her mean. (Tr. 555-56.)

On October 1, 2007, plaintiff reported to disability determinations that only her leg injury from the accident prevented her from working. Plaintiff reported that her allegations of other impairments, including learning disability and blood clots in her lungs, did not prevent her from working. (Tr. 562.)

On May 28, 2008, plaintiff underwent a consultative psychological evaluation for disability determinations. Dr. Paul W. Rexroat observed plaintiff to have no speech, visual or hearing difficulties, and noted plaintiff to exhibit appropriate skill with gross motor movements and age-appropriate skill with fine motor movements. Dr. Rexroat noted plaintiff to generally understand instructions readily. Plaintiff was administered the Wechsler Adult Intelligence Scale-III and obtained the following IQ scores: verbal-69, performance-78, full scale-71. Significant weaknesses in comparison to peers were noted in subtests involving language development and word knowledge, logical abstractive thinking, computational skills, immediate auditory memory, range of general factual information, judgment and common sense, analysis and synthesis of visually presented material, visual information processing and abstract reasoning skills, and interpretation of social situations and nonverbal reasoning. No significant strengths were noted. Upon review of the evaluation results, Dr.

Rexroat opined that plaintiff functioned in the borderline range of intellectual functioning, suggesting that plaintiff could perform and learn cognitive/intellectual tasks at a level below that of same aged peers. Mental status showed plaintiff to be oriented times four; not to be suspicious, anxious, tense, or weepy; and to exhibit a normal range of emotional responsiveness and normal affect. Plaintiff's speech was normal, coherent and relevant. Plaintiff reported frequent mood swings, crying spells, irritability, and low self esteem. Dr. Rexroat noted plaintiff to describe significant symptoms of major depression with mild psychotic features. As to plaintiff's functional limitations, Dr. Rexroat opined that plaintiff was able to understand and remember simple instructions and could sustain concentration and persistence with simple tasks. Dr. Rexroat further opined that plaintiff had mild limitations in her abilities to interact socially and adapt to her environment. Dr. Rexroat opined that in the domains of activities of daily living and social functioning, plaintiff had mild limitations as demonstrated by plaintiff's reported ability to do all of the housework, laundry and cooking, and also that she drove a car. Dr. Rexroat noted plaintiff to exhibit good social skills and that plaintiff reported having a best friend, although such person had moved away. Plaintiff also reported going to church. In the domain of concentration, persistence, pace, and memory, Dr. Rexroat reported that plaintiff was able to sustain

concentration, persistence and pace with simple tasks but that plaintiff's memory functioning was far below average. Dr. Rexroat opined that plaintiff could not manage her own funds because of her very weak math calculation skills and her overall low level of intellectual functioning. In conclusion, Dr. Rexroat diagnosed plaintiff with major depression, recurrent, with mild psychotic features; and borderline intelligence. Dr. Rextroat assigned a GAF score of 49. (Tr. 768-72.)[6]

In a Psychiatric Review Technique Form completed June 11, 2008, Dr. James Spence with disability determinations opined that plaintiff's borderline intellectual functioning and major depression disorder resulted in mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation of extended duration. (Tr. 773-83.) Dr. Spence noted in an accompanying Mental Residual Functional Capacity (RFC) Assessment that plaintiff's school records showed her to have earned average to low grades and that plaintiff passed the United States Constitution and American Institutions exams which were required for graduation. Dr. Spence also noted that plaintiff reported that she obtained her

---

[6]A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR 34.

previous employment positions independently after having applied for the positions. (Tr. 784-87.)

On December 4, 2009, plaintiff underwent another disability evaluation by Dr. Gholson. During this evaluation, plaintiff reported that she suffered from depression. Plaintiff reported that she experienced some speech delay. Plaintiff reported being in special education classes in high school. Plaintiff reported not having any behavioral problems as a child, and that she got along well with her parents. Plaintiff complained that she worried about many things and feared being alone. Plaintiff reported that her energy was low, that she preferred isolation and limited activities, and that she experienced frequent irritability and crying. Plaintiff reported that she had no friends. Plaintiff reported having a current diagnosis of depression and that she was taking Celexa as prescribed by FNP Dicus. On a Mental Status Examination checklist, Dr. Gholson rated plaintiff as average to low average in nearly all areas of Appearance, Affect, Thought Processes, Intellectual Functions, Insight, and Judgment. Dr. Gholson rated plaintiff's general intelligence and intellectual insight as average, but questioned his rating. Plaintiff's attention and concentration were noted to be fair. Dr. Gholson diagnosed plaintiff with major depressive disorder, mild mental retardation, and increased blood pressure. Dr. Gholson assigned a GAF score of 50. (Tr. 1188-93.) On that

same date, Dr. Gholson reported to the Missouri Department of Social Services that plaintiff suffered from depression and had been diagnosed with major depressive disorder and mild mental retardation. Dr. Gholson opined that plaintiff would be incapacitated from these impairments for thirteen months. (Tr. 1085-86.)

On February 3, 2010, plaintiff underwent a physical social security and disability evaluation at the Brain and NeuroSpine Clinic of Missouri. Plaintiff reported that she applied for disability because of left knee pain and mental slowness. Plaintiff reported graduating from high school in special education classes and having previously worked for her husband laying carpet. Plaintiff reported that she was currently able to independently perform activities of daily living. Mental status examination was unremarkable. Plaintiff's speech was noted to be normal for her age. Upon conclusion of the examination, Dr. Annamaria Guidos completed a Physical Medical Source Statement of Ability to do Work-Related Activities. (Tr. 1194-1211.)

On February 3, 2010, plaintiff underwent a consultative psychological evaluation for disability determinations. Dr. Rexroat noted plaintiff to allege disability for, *inter alia*, learning disability. Plaintiff reported that she could not count money, did not know math, and could not spell well. Plaintiff reported graduating high school after having attended special

- 14 -

education classes and that she worked in a nursing home while in high school, worked as an in-home aide for one year, and then worked with her husband for five years laying carpet. Mental status examination showed plaintiff to be slightly anxious and tense and to cry intermittently throughout the evaluation. Plaintiff exhibited a mildly restricted range of emotional responsiveness and a slightly flat affect. Plaintiff was not suspicious. Plaintiff's speech was normal, coherent and relevant. Plaintiff reported that she was depressed and felt as though no one liked her. Plaintiff reported being easily irritated and withdrawn. Plaintiff reported feeling somewhat hopeless and had low self esteem. Plaintiff also reported that she was forgetful. Upon examination as to cognitive functioning, Dr. Rexroat opined that plaintiff functioned in the below average range of intelligence. Dr. Rexroat noted plaintiff to describe significant symptoms of panic disorder and of major depression with psychotic features. As to plaintiff's functional limitations, Dr. Rexroat opined that plaintiff was able to understand and remember simple instructions and could sustain concentration and persistence with simple tasks. Dr. Rexroat further opined that plaintiff had mild limitations in her abilities to interact socially and adapt to her environment. Dr. Rexroat opined that in the domains of activities of daily living and social functioning, plaintiff had mild limitations. Plaintiff reported that she no longer had friends

because they all moved away but that she gets along well with others.  Plaintiff reported that she and her husband go out to eat once a month.  In the domain of concentration, persistence, pace, and memory, Dr. Rexroat reported that plaintiff was able to sustain concentration, persistence and pace with simple tasks but that plaintiff's memory functioning appeared to be below average.  Dr. Rexroat opined that plaintiff could not manage her own funds because of her weak math calculation skills.  In conclusion, Dr. Rexroat diagnosed plaintiff with major depression, recurrent, moderate with psychotic features; and panic disorder without agoraphobia.  Dr. Rextroat assigned a GAF score of 52.  (Tr. 1212-20.)[7]

A review of the record in its entirety shows that from 1996 through 2009, plaintiff visited the Community Care Center as her treating medical facility on numerous occasions for general wellness examinations, treatment of routine physical complaints such as headaches and ear pain, routine lab work, follow up of accident injuries, and transient treatment of anxiety.  Each examination is documented by treatment notes which include a form entitled "Physical Exam-Abnormals and Pertinent Normals Noted."

[7]A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV-TR 34.

(See, e.g., Tr. 429.)  On this form, "Educational Impairment" is listed as an item for examination.  (E.g., id.)  At no time during any of plaintiff's examinations at the Community Care Center were any notations made that plaintiff experienced an educational impairment; nor were any findings other than "none" made regarding an educational impairment.

## IV.  The ALJ's Decision

In his written decision, the ALJ found that plaintiff met the disability insured status requirements from October 1, 2005, through March 31, 2010, and had not engaged in substantial gainful activity since the alleged onset of disability, that is, since May 25, 2005.  (Tr. 13, 18.)  The ALJ found plaintiff's impairments of healed left tibial plateau fracture, resolved deep venous thrombosis, major depression, panic disorder, learning disorder, and borderline intellectual functioning to constitute severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpt. P, App. 1.  (Tr. 13-15.)

The ALJ determined plaintiff to have the RFC to lift up to fifty pounds continuously; to sit, stand or walk for four hours at one time without interruptions; and to sit, stand and walk for eight hours total in an eight-hour workday.  The ALJ found plaintiff not able to engage in more than occasional climbing ladders or scaffolds, or more than occasional kneeling and

crawling. The ALJ found that plaintiff could never work around unprotected heights, and that plaintiff was limited to simple, repetitive work without close interaction with the public. (Tr. 15-16.) Based upon vocational expert testimony, the ALJ determined that plaintiff's RFC permitted her to perform her past relevant work as a carpet laying assistant, nurses aid and Head Start assistant, as well as other work as it exists in significant numbers in the national economy such as dishwasher and file clerk. (Tr. 17-18.) The ALJ therefore found plaintiff not to be under a disability at any time through the date of the decision. (Tr. 20.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to

do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner determines the claimant's RFC and determines whether the claimant can perform her past relevant work. If so, the claimant is not disabled. If the Commissioner finds that the claimant cannot do her past relevant work, the Commissioner then proceeds to the fifth step of the evaluation process whereby he considers the claimant's RFC, together with the

claimant's vocational factors (age, education and work experience), and determines if the claimant can make an adjustment to other work.  If the claimant can make such an adjustment, the claimant is found not to be disabled.  If the Commissioner finds the claimant unable to perform such other work, the claimant is determined to be disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

In challenging the ALJ's decision here, plaintiff argues

only that the ALJ erred at Step 3 of the sequential evaluation by not finding plaintiff's impairments to meet Listing 12.05 of the Listings of Impairments.  For the following reasons, plaintiff's contention is without merit and the Commissioner's decision should be affirmed.

Listing 12.05 states, in relevant part:

Mental retardation:  Mental retardation refers to significantly subaverage general intellectual functioning *with deficits in adaptive functioning* initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added).

The requirements in the introductory paragraph to Listing 12.05 are mandatory.  <u>Maresh v. Barnhart</u>, 438 F.3d 897, 899 (8th Cir. 2006). "Those requirements clearly include demonstrating that the claimant suffer[s] 'deficits in adaptive functioning[.]'"  <u>Cheatum v. Astrue</u>, 388 Fed. Appx. 574, 576 (8th Cir. 2010) (per curiam) (citing <u>Randall v. Astrue</u>, 570 F.3d 651, 659–60 (5th Cir. 2009)).

- 22 -

The claimant bears the burden of establishing that she meets the criteria of Listing 12.05, including the deficits-in-adaptive-functioning requirement in the introductory paragraph. <u>See</u> <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 894 (8th Cir. 2006).

According to the DSM-IV-TR, "adaptive functioning" refers to

> how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural back ground, and community setting. Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation. Problems in adaptation are more likely to improve with remedial efforts than is the cognitive IQ, which tends to remain a more stable attribute.

DSM-IV-TR at 42.

For the following reasons, the ALJ's determination that plaintiff failed to meet the criteria of Listing 12.05 is supported by substantial evidence on the record as a whole inasmuch as plaintiff failed to establish the requisite deficits in adaptive functioning.

In his decision here, the ALJ noted that Dr. Rexroat reported during his consultative examinations that plaintiff was able to understand instructions; performed activities of daily living such as cooking, cleaning and laundry; and drove a car.

(Tr. 14.)  In February 2010, plaintiff reported to Dr. Guidos that she could independently perform all activities of daily living. The ALJ also noted that records from plaintiff's treating medical facility, the Community Care Center, showed plaintiff not to have any educational impairments.  (Id.)  As noted supra, plaintiff visited this facility on numerous occasions for routine and follow up appointments during which time the respective health care provider(s) specifically indicated that plaintiff did not suffer from an educational impairment.  These medical records make no mention of any suspected intellectual impairment.  See Popp v. Heckler, 779 F.2d 1497, 1500 (11th Cir. 1986 (per curiam) (ALJ required to examine IQ results in conjunction with other medical evidence and claimant's daily activities and behavior), cited approvingly in Clark v. Apfel, 141 F.3d 1253 (8th Cir. 1998).

In addition, the evidence shows that plaintiff was successfully employed for a number of years as a nurses aid, teaching assistant and carpet laying assistant and only left her most recent employment on account of physical injuries sustained in the three-wheeler accident.  See Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004) (significant under § 12.05 analysis that claimant had never been terminated from a job for lack of mental ability); see also Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (claimant not disabled by mental impairment where he had worked with cognitive abilities he currently possessed).  Such

consistent and successful employment would appear to show that plaintiff was effective in her ability to cope with common life demands and sufficiently meet the standards of personal independence. Further, the undersigned notes that plaintiff's only diagnosis of mild mental retardation came from examining psychologist Dr. Gholson in December 2009, but, as noted by the ALJ, Dr. Gholson reported during this same evaluation that plaintiff's general intelligence appeared to be average. In addition, the undersigned notes that two and a half years prior, that is, in July 2007, Dr. Gholson made no mention of mental retardation, mild or otherwise, during his evaluation of plaintiff, and indeed rated plaintiff's thought processes, intellectual functions, and attention and concentration as average. See Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005) (in § 12.05 analysis, absence of record of treatment, diagnosis or even inquiry into mental impairment prior to applying for benefits weighs against finding there to be an impairment). Given the internal inconsistencies in Dr. Gholson's report(s), as well as the inconsistencies between plaintiff's demonstrated abilities and Dr. Gholson's opinion of mild mental retardation, the ALJ did not err in according this opinion little weight. Id. at 930.

To the extent plaintiff claims the ALJ erred by failing to consider plaintiff's school records that showed her to have obtained poor grades and to have been enrolled in special education

classes, the undersigned notes that Dr. Spence specifically referred to these school records in his Mental RFC Assessment and that the ALJ considered this Assessment in determining plaintiff's RFC. (Tr. 17.) The fact that the ALJ did not specifically mention plaintiff's school records in his written decision does not mean that he did not consider them. <u>Montgomery v. Chater</u>, 69 F.3d 273, 275 (8th Cir. 1995). This is especially true here where the ALJ specifically mentioned evidence that discussed such records. Nevertheless, given the substantial evidence demonstrating plaintiff's significant abilities to engage in adaptive functioning, isolated evidence of poor performance in school is insufficient to establish mental retardation under Listing 12.05. <u>See</u> <u>Clay</u>, 417 F.3d at 929. For this same reason, plaintiff's argument that the ALJ erred by failing to order additional school records must fail. <u>Jones v. Astrue</u>, 619 F.3d 963, 969 (8th Cir. 2010) (ALJ obligated to obtain additional evidence only when records presented to him do not give sufficient evidence to determine whether claimant is disabled).

Finally, plaintiff argues that regardless of the manner of the ALJ's analysis of the evidence, the record nevertheless conclusively establishes that plaintiff meets the criteria of Listing 12.05(C) inasmuch as she has a valid verbal IQ score of 69 and undisputed additional physical and mental impairments imposing additional and significant work-related limitation of function.

Although plaintiff meets these two criteria of subsection C of Listing 12.05, to end the inquiry there would ignore the Eighth Circuit's explicit statement in <u>Maresh</u> that "the requirements in the introductory paragraph [of § 12.05] are mandatory." <u>Maresh</u>, 438 F.3d at 899. Those requirements clearly include demonstrating that a claimant suffer "deficits in adaptive functioning." Because substantial evidence supports the ALJ's determination that plaintiff failed to meet all criteria of Listing 12.05, including "deficits in adaptive functioning," the ALJ did not err in finding that plaintiff's cognitive impairment did not meet the Listing.

## VI. Conclusion

Substantial evidence supports the ALJ's conclusion that plaintiff impairments do not meet Listing 12.05(C) inasmuch as plaintiff failed to establish deficits in adaptive functioning necessary to meet the criteria as set out in the Listing's introductory paragraph. Accordingly, because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff was not under a disability should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Acting Commissioner of Social Security Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as defendant in this cause.

**IT IS FURTHER ORDERED** that the decision of the

Commissioner is affirmed and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

_____
UNITED STATES MAGISTRATE JUDGE

Dated this __4th__ day of September, 2013.